IN THE UNITED STATES DISTRICT COURT **SEALED**

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | *    CRIMINAL NO. 6:06CR 40 |
| v. | *    DAVIS/LOVE |
| | * |
| MICHAEL J. WING | * |

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS
APR - 4 2006
BY _____
DEPUTY
DAVID J. MALAND, CLERK

### INDICTMENT

THE UNITED STATES GRAND JURY CHARGES THAT:

### COUNTS 1-18

Violation: 18 U.S.C. § 1343
(Wire Fraud)

## A. INTRODUCTION

At all times material to this Indictment:

1.     MICHAEL J. WING was an attorney licensed to practice in the State of Texas.  WING represented himself to others as an expert in the field of mergers and acquisitions.

2.     WING controlled bank accounts in a number of banks and financial institutions.  The accounts were held in a number of different names, including:  Michael J. Wing, P.C., Attorney at Law; MPW Holdings, LLC; Auburn Creek Thoroughbred Horse Farm, LLC, Wing Ranch, LLC; and Michael J. or Pamela C. Wing.

## B. THE SCHEME AND ARTIFICE TO DEFRAUD

3.     In or about 2002 and continuing through the present, WING did devise and intend to devise a scheme and artifice to defraud persons and to obtain money from them by means of

1

materially false and fraudulent pretenses, representations and promises.

## C. THE MANNER AND MEANS OF THE SCHEME AND ARTIFICE

It was part of the scheme and artifice that:

4.      WING would approach an investor, usually someone he personally knew or a person he had met through an acquaintance, and offer them an opportunity to participate in a "bridge loan". WING would describe the bridge loan opportunity to the potential investor, making numerous fraudulent representations.

5.      WING would fraudulently represent that a large, publicly-traded multi-national company, often described by WING as a Fortune 500 corporation, was in the process of merging with or acquiring another large company. WING typically told the potential investor that he could not identify the entities involved due to securities laws governing insider trading.

6.      WING represented that the acquiring company had experienced a gap in the funding of the merger/acquisition and that the acquiring company was seeking bridge financing in order to complete the transaction. WING further explained that the transaction was in a critical stage and that the deal would fall through if the gap in funding could not be remedied immediately. WING further represented that the acquiring company could not obtain funding through traditional means because this might give competitor companies the opportunity to step in and acquire the target company.

7.      WING would then tell the potential investor that the acquiring company had approached him to assist in locating investors who would provide a bridge loan to fund the financing gap. WING represented that the overall value of the merger was so large that the acquiring company was willing to pay a premium return for this short-term financing. While there were some

2

variances, WING generally represented that investors would receive a transaction fee ranging from 50-100% of the amount loaned, repayment of principal, interest, and in some bridge loan opportunities, a contribution to be made to the charity of the investor's choice.

8.      WING further explained that he was unable to participate personally in the bridge loan because he was the attorney for the acquiring company. He represented that the transactions were virtually risk free. To allay any concerns the investors might have, WING agreed to personally guarantee repayment of the promissory note and provided the investor with an unaudited personal financial statement showing a net worth of millions, and in some instances, hundreds of millions, of dollars. WING materially overstated his net worth and included numerous false statements regarding the value and ownership of the listed assets.

9.      WING never identified the companies involved in the purported mergers/acquisitions. To create an appearance of legitimacy, WING created false or fictitious entities with code names such as the Pinnacle Group, the Woodbridge Group, the Johnson Group, the Webster Group, Renaissance Investments, LLC, and numerous others. These entities were supposedly independent companies, represented by WING as an attorney, whose purpose was to facilitate the merger/acquisition by holding the bridge loan money until it was needed at the closing by the acquiring company.

10.     WING did not use the money provided by the investors for bridge loans. Instead, he diverted the invested funds and used them for his own personal and business expenses or to pay other investors he had defrauded.

11.     Some investors never received any return of their principal, interest or transaction fee. Some received partial repayments of their principal investment. Others either threatened, or

actually brought, legal action against WING.  In a number of instances, investors sued or

threatened to sue WING, and WING entered into an agreed judgment or otherwise agreed to pay

the aggrieved investor.  WING then solicited other investors in new bridge loan transactions.  In

several instances, he instructed the new investor to wire transfer the investment money to the

trust accounts of law firms that he represented were assisting in the handling of the

mergers/acquisitions.  In reality, these law firms had either represented WING on unrelated

matters or were representing WING's previous victim/investors and would accept the monies on

behalf their clients, thereby unwittingly facilitating a Ponzi scheme by WING and enabling

WING to prolong his fraudulent scheme.

12.     Throughout the course of the scheme and artifice, WING made extensive use of interstate

wire communications to defraud investors.  WING utilized facsimile transmissions, electronic

mail (e-mail) sent via the Internet, wire transfers of monies, and telephone calls both as a means

of inducing investors to invest in the fraudulent bridge loan transactions and to "lull" investors

when they made inquiries and demands for the returns WING had promised on their investments.

### Representative Transactions

13.     During the course of the scheme and artifice, WING defrauded the following investors,

along with numerous others, as detailed herein:

### Investors 1 and 2- MW and MM
### Renaissance Investment LLC

14.     In or about June 5, 2003, WING contacted MW.  WING told MW that he had a bridge

loan opportunity and that he needed to raise $900,000 in twenty-four hours.  WING represented

to MW that he was representing a foreign company that was merging with another company, and

that the two companies were then going to acquire a third airline company. WING represented

that the company he represented needed the bridge loan to accomplish the merger. WING

represented that the loan would be repaid within thirty days. WING promised MW return of his

investment, a transaction fee of 20% of the amount invested, and interest at the rate of 10%

percent per annum. WING also promised MW a finder's fee for each investor MW brought in for

a total investment of $500,000. WING represented that he would personally guarantee

repayment of the investment.

15.     Based on WING's representations, MW solicited MM to invest in the transaction. MW

agreed to invest $200,000 and MM agreed to invest $300,000. WING sent MW and MM each a

Promissory Note. The Maker of the Promissory Note was an entity identified only as

"Renaissance Investment LLC" ("Renaissance"). WING signed the Promissory Notes, both as

representative of Renaissance and as Guarantor. WING instructed MW and MM to wire transfer

the investment funds to a law firm trust account in Longview, Texas. WING represented to them

that the law firm was involved in the merger/acquisition of the airline companies.

16.     There was in fact no bridge loan or merger/acquisition. The law firm in Longview

instead represented an individual who was involved in an unrelated business transaction with

WING. Rather than invest MW and MM's monies as he had promised, WING used their

investment to pay a debt he owed to the individual represented by the law firm.

17.     When MW and MM did not receive either the promised return or their original

investments after several months, each contacted WING on several occasions. WING provided

numerous excuses why payment had not been received. In or about October 2003, WING sent a

check for $206,000 to MW and a check for $315,000 to MM. Both checks bounced due to

insufficient funds.

### Investor 3 - CT
### a) Pinnacle Partners, LP

18.     In or about August 2003, WING contacted CT through another individual. WING

represented to CT that he was attorney of record for a company involved in a merger/acquisition.

WING did not identify the companies involved in the merger/acquisition. WING represented

that there was a $9.5 million shortfall in funding, and that he was putting together a group of

investors under the name Pinnacle Partners, LP, to fund a bridge loan for that amount. WING

represented to CT that the transaction was of such value that the company he represented was

willing to pay a premium for the funding. WING promised CT a transaction fee of 100% of the

amount invested, return of her principal, and interest at the rate of 7.5% per annum.

19.     WING provided, or caused to be provided, to CT a number of documents, including a

Promissory Note and WING's personal guarantee of repayment. Based upon WING's

representations, CT wire transferred a total of $1,450,000 to an account under WING's control.

20.     There was, in fact, no merger/acquisition. WING did not use CT's money to provide a

bridge loan. Instead, he diverted the money, using it for personal purposes and for payments to

investors in prior purported bridge loan transactions.

### b.) Renaissance Investment LLC

21.     Approximately thirty days later, before CT expected to be paid for the Pinnacle Partners

transaction, in or about September 2003, WING solicited CT to invest in another bridge loan

transaction. Once again, WING represented that there was a shortfall in the funding of a large

merger/acquisition, and that the companies involved were willing to pay a premium return for a

bridge loan. WING represented that the bridge loan was of short duration and would be repaid in approximately 45 days.

22.     Based on WING's representations, CT agreed to invest $1,050,000, which represented $800,000 of her funds and $250,000 from an associate. In exchange for the investment, CT and her associate were to receive a transaction fee of 100% of the amount invested, return of principal, and interest at the rate of 7.5% per annum. WING agreed to pay CT a finder's fee in exchange for successfully soliciting the associate's investment. Pursuant to WING's instructions, CT caused the funds to be wire transferred to a bank account under WING's control.

23.     There was, in fact, no merger/acquisition. WING did not use CT's money to provide a bridge loan. Instead, he diverted the money and used it for personal purposes.

24.     When CT did not receive either the promised return or her original investments with Pinnacle Partners or Renaissance Investments after several months, she contacted WING on several occasions and ultimately hired an attorney in an effort to recover her investment. WING provided both CT and her attorney numerous excuses why payment had not been received. In or about January 2, 2004, WING wire transferred $250,000 to CT's bank account. These funds were not a return generated by the investment of CT's money, as WING represented. Instead, WING obtained them by defrauding a subsequent investor.

### Investor 4 - RB
#### a.) Higgons Group LLC

25.     In or about June 4, 2004, WING contacted RB through another individual. WING solicited RB to participate in a bridge loan transaction involving an entity identified only as the Higgons Group LLC ("Higgons"). WING made representations to RB similar to those which

have been previously described in this Indictment regarding the nature of the transaction and the need for short term financing.

26.     Based upon WING's representations, RB agreed to invest $500,000.  In exchange for his investment, WING promised RB a return of 100% of the amount invested, return of principal, and interest at the rate of 7% per annum.  WING provided RB with documents that included a Promissory Note, a Security Agreement that included WING's personal guarantee of repayment, allegedly secured by $1,000,000 in assets, and instructions to wire transfer the funds to an account under WING's control.  The note was due and payable on June 25, 2004

27.     There was, in fact, no merger/acquisition.  WING did not use RB's money to provide a bridge loan to any major corporation.  Instead, he diverted the money and used it for personal purposes and to make payments to individuals whom WING had defrauded in other transactions.

### b.) Johnson Realty Group

28.     In or about late June 2004, WING contacted RB and asked if RB wanted to roll his investment and return from the Higgons transaction into another bridge loan opportunity.  WING represented that RB was due a total of $1,000,000 from the Higgons transaction.  WING represented to RB that the new bridge loan transaction, identified only as the Johnson Realty Group ("Johnson"), would pay a transaction fee of 100%, return of principal, and interest at the rate of 7% per annum, for a total return of $2,000,000, plus interest, on RB's initial investment of $500,000.

29.     RB agreed to roll his earlier investment into the Johnson transaction.  WING sent RB a number of documents, including a Promissory Note and Security Agreement that included WING's personal guarantee of repayment secured by $1.5 million in assets.

8

30.     There was, in fact, no merger/acquisition.  WING did not use RB's money to provide a bridge loan.  In fact, WING had already dissipated the funds which RB had invested in the Higgons transaction.

### c.)  Wilson Group

31.  At or about the same time, WING solicited RB to invest in a purported bridge loan transaction involving an entity identified only as the Wilson Group.  WING represented that the bridge loan was of very short duration, and that RB would receive a 100% transaction fee, return of principal, and interest at the rate of 7% per annum.  Based on WING's representations, RB agreed to invest $250,000.  WING furnished RB with a Promissory Note and Security agreement that included WING's personal guarantee of repayment secured by $1 million in assets.  WING instructed RB to wire transfer the money in three increments to three different accounts.

32.     There was, in fact, no merger/acquisition.  WING did not use RB's money to provide a bridge loan.  Instead, he diverted the money and used it for personal purposes and to make a payment to an individual whom WING had defrauded in another transaction.

### d.)  Unnamed Transaction

33.     In or about October 29, 2004, while promising RB imminent payment of the $2 million return from the Johnson transaction detailed above, WING solicited RB to loan him money in connection with a "significant opportunity".  Unlike other transactions WING did not identify the acquiring company by code name.  WING represented to RB that three "manifestation payments" were required in order to accomplish the transaction.  WING also represented to RB that the three payments were to be made to the trust accounts of three different law firms handling the other side of the business transaction.

9

34.     WING solicited a total of $440,000 from RB and promised to pay a 100% return for an investment of three weeks. RB wire transferred the money to the three law firms. The law firms were not, in fact, involved in a business transaction with WING. One firm had represented WING in an unrelated civil matter. The other two firms were involved in collecting monies that WING owed to other investors/victims whom he had defrauded, including Investor TF below.

### Investor 5 - TF
### Baker Group

35.     In or about late June or early July 2004, TF was introduced to WING by another individual. WING solicited TF to invest in a bridge loan transaction involving an entity identified only as the Baker Group. WING made representations similar to those set forth above regarding the nature of the transaction and the need for short-term financing. In exchange for TF's investment, WING promised a transaction fee of 50% of the amount invested, return of principal and interest in the amount of 7% per annum. The loan was to be for a period of ninety days. TF agreed and, on July 7, 2004, wire transferred a total of $200,000 to an account under WING's control.

36.     There was, in fact, no merger/acquisition. WING did not use RB's money to provide a bridge loan. Instead, he diverted the money and used it for personal purposes and to make payments to individuals he had defrauded in other transactions.

## D. THE WIRE COMMUNICATIONS

37.     On or about the dates set forth below, in the Eastern District of Texas and elsewhere, the Defendant MICHAEL J. WING, for the purpose of executing, and attempting to execute, the

10

scheme and artifice, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals, and sounds, the following:

| Count | Date | To | From | Description of Wire Communication |
|---|---|---|---|---|
| 1 | 6/04/2003 | MM in Georgia | Michael Wing in Texas | Facsimile transmission of documents |
| 2 | 6/04/2003 | Law Firm in Longview, Texas | MM in Georgia | Wire transfer in the amount of  $300,000 |
| 3 | 8/28/2003 | MM in Georgia | Michael Wing in Texas | Wire transfer in the amount of $60,000 |
| 4 | 8/27/2003 | CT in Arizona | Michael Wing in Texas | Facsimile transmission of documents |
| 5 | 8/27/2003 | Michael Wing in Texas | RBC Dain, Rauscher in Arizona | Wire transfer in the amount of $1,150,000 |
| 6 | 9/04/2003 | Michael Wing in Texas | CT in Arizona | Wire transfer in the amount of $300,000 |
| 7 | 9/22/2003 | CT in Arizona | Michael Wing in Texas | Facsimile transmission of documents |
| 8 | 9/23/2003 | Michael Wing in Texas | Northern Trust in Arizona | Wire transfer in the amount of $250,000 |
| 9 | 9/24/2003 | Michael Wing in Texas | CT in Arizona | Wire transfer in the amount of $400,000 |
| 10 | 9/24/2003 | Michael Wing in Texas | CT in Arizona | Wire transfer in the amount of $400,000 |
| 11 | 6/04/2004 | RB in California | Michael Wing in Texas | Facsimile transmission of documents |
| 12 | 6/04/2004 | Michael Wing in Texas | RB in California | Wire transfer in the amount of $500,000 |

| 13 | 6/25/2004 | RB in California | Michael Wing in Texas | Facsimile transmission of documents |
| 14 | 6/25/2004 | Michael Wing in Texas | RB in California | Wire transfer in the amount of $40,000 |
| 15 | 10/29/2004 | RB in California | Michael Wing in Texas | E-mail describing business opportunity and containing wire transfer instructions |
| 16 | 7/07/2004 | Michael Wing in Texas | Morgan Stanley Dean Witter in Washington, DC | Wire transfer in the amount of $175,000 |
| 17 | 7/09/2004 | SF in Colorado | Michael Wing in Texas | Wire transfer in the amount of $145,000 |
| 18 | 7/19/2004 | Morgan Stanley Dean Witter in Washington, DC | Michael Wing in Texas | Facsimile transmission of documents |

All in violation of Title 18 U.S.C. Section 1343.

A TRUE BILL,

FOREPERSON OF THE GRAND JURY

Date: 4/4/06

MATTHEW D. ORWIG
UNITED STATES ATTORNEY

WES RIVERS
Assistant United States Attorney
Bar Card No. 16959200

ARNOLD A. SPENCER
Assistant United States Attorney
Bar Card No. 00791709

110 N. College, Suite 700
Tyler, Texas  75702
903-590-1400
903-590-1439 (facsimile)

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

### Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461

As the result of committing one or more of the foregoing offenses [any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title)] alleged in this Indictment, MICHAEL J. WING, Defendant herein, shall forfeit to the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real or personnel, which constitutes or is derived from proceeds traceable to the aforementioned violation[s], including but not limited to the following:

**Cash Proceeds**

Approximately $3,575,000 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the foregoing offenses alleged in this Indictment.

**Substitute Assets**

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant -

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with a third person;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot

be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 21

U.S.C. § 853(p), to seek forfeiture of any other property of Defendant up to the

value of the above forfeitable property, including but not limited to all property,

both real and personal owned by Defendant.

By virtue of the commission of the offenses alleged in this Indictment, any and all interest the

Defendant has in the above-described property is vested in the United States and hereby forfeited

to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   CRIMINAL NO. 6:06CR____ |
| | * |
| MICHAEL J. WING | * |

## **NOTICE OF PENALTY**

### **COUNTS 1 through 18**

VIOLATION:          18 United States Code § 1343 (Wire Fraud)

PENALTY:            Imprisonment of not more than 20 years, a fine of not more than
                    $250,000 or twice the amount of monetary gain or loss, or both;
                    supervised release of not more than 3 years.

SPECIAL ASSESSMENT:   $100.00 each count